Justine Wise Polier, J.
This case raises serious question as to the adequacy of New York legislation to protect the “ battered ’ ’ or abused child, the procedures under the legislation, and its implementation in New York -City.
The first neglect petition on her behalf was filed by the Society for the Prevention of Cruelty to Children on November 5, 1965, when she was nearly three years old.
Earlier in 1965, Sydenham Hospital had reported to the Protective Unit of the Department of Welfare suspicion that injuries they found on August 18, 1965 could not have resulted from a fall in a bathtub as reported by the stepfather, and that this was a “battered child”. The medical testimony before the court presented hospital findings including marked redness of both legs, softening of soles of both feet, bluish areas on the buttocks and legs, and red areas on back and chest. There were also discolored areas on the back, chest, abdomen, legs, face, forehead and neck. The lesions were suggestive of belt or strap marks. The abrasions were suggestive of finger nail marks. The child was extremely docile, apprehensive, petrified, but became less fearful during the hospital stay. On August 24, 1965, on the decision of the Protective Unit, the child was discharged to the parents with a referral for clinic care. There was no record of subsequent clinic attendance. There was no referral for court action.
Two months later this small child was taken to a different hospital (Harlem) on October 16, 1965 by the mother. At that time the physician could not obtain a history of the injury from *374 the mother. Physical finding, however, included a lesion on the buttocks that appeared to be a healing second degree burn and a second lesion on the right leg. Treatment was given in the hospital and the mother was directed to take the infant to the clinic for further care. Although the examining physician testified that in his opinion the injuries were at least 6 to 12 hours old, he testified that it was not his business to investigate.
The suspicion of the first hospital was promptly reported to the Protective "Unit. The second injury was not reported. On the undertaking of the Protective Unit in August to supervise the child, the child was discharged to the parents. The supervision was delegated to a professionally untrained worker, who made one visit on September 21, 1965 and one on October 22, 1965. He did not secure the written report from Sydenham Hospital until October 8, 1965. When it was then decided to “ double-check ”, the investigator went out on a visit two weeks later. The child had already received the second injuries. The child was not present, and he did not investigate although the parents mentioned that the child had received a minor bruise from being pushed against a radiator by a dog.
It was only through the fortunate incident of a family wedding later in October, 1965, that the grandmother called to take the child and discovered burns, raw open sores all over the baby’s rectum, and bruises on her forehead and arms. It was she who took the baby home and called the Society for the Prevention of Cruelty to Children. When their representative called and observed the infant’s condition, he insisted on hospital examination, notified the Department of Welfare and filed a neglect petition in this court.
At the hearing on December 21, 1965, both the mother and stepfather gave a history of the child having fallen while being bathed by the stepfather, to explain the first injuries in August. They sought to explain the second injuries as resulting from the baby being pushed against a radiator by a dog. The mother, aged 19, testified that the child was born out of wedlock and that she had married the stepfather, who was also 19, some five months earlier. Both the mother and father were defensive and evasive throughout their testimony as to how this infant had been injured. A finding of neglect was made and the child was paroled in the custody of the maternal grandmother.[1] Psychiatric studies of the mother and stepfather were ordered.
*375 Spurred by reports of an increase in the number and violence of attacks on infants and young children by parents and caretakers, at a symposium in 1961 on “ The Battered Child” at the American Academy of Pediatrics, the Children’s Bureau undertook to assemble information and start action. It had earlier developed a legislative guide to assure identification, protection and treatment for such children.[2]
[3]
In a 1963 pamphlet, the Children’s Bureau took the position that cases of injury inflicted by parents “must be promptly called to the attention of appropriate agencies of government for investigation and such action as reasonably may be indicated, whether these cases are referred to social welfare agencies or the courts ”.[3] To secure prompt reporting the proposed legislation required that when a physician had reasonable cause to suspect that physical injury had been inflicted by a parent or person responsible for the care of a child, neither he nor the institution should have any discretion in the matter of notifying the appropriate police authority. The elements for such reasonable judgment were seen as:
The absence of the reasonably explainable results through accident.
The infliction of the injuries in the family setting.
The judgment based on his professional experience.
The proposed legislation presupposed existence of adequate, applicable and social machinery for the protection of children and the handling of persons responsible. It required immediate investigation by the police or the public welfare agency and further assumed the matter would be brought before the juvenile court, and possibly subject adults to criminal court jurisdiction.
Since 1963 the United States Children’s Bureau has actively promoted legislation to require physicians to report cases where there was evidence that injuries might have been inflicted by parents or persons having custody of a child.
In 1960, only one State, California, had legislation to protect children from physical abuse. In August, 1965, Mrs. Oettinger, Chief of the Children’s Bureau, announced that 46 States had *376 adopted such laws of whom 25 States had acted in 1965[4] In making this announcement, Mrs. Oettinger stated she saw the legislation as a necessary hut only first step in getting at the problem. While acknowledging that there was no exact knowledge as to how many “battered babies” there were in the United States she stated that “ we do know the number is growing ”. Mrs. Oettinger noted that the cases were “ not limited to any one segment of our population — either by level of income or occupation ”. The importance of providing protective services and substitute homes where needed to protect a child from further and serious injury was emphasized.
In 1963 the Journal of the American Medical Association wrote: “ It is likely that it (physical abuse of children) will he found to be a more frequent cause of death than such well recognized and thoroughly studied diseases as leukemia, cystic fibrosis and muscular distrophy, and may well rank with automobile accidents and the toxic and infections encephalitis as causes of acquired disturbances of the central nervous system.”[5]
*377 A subsequent study by a group of workers in the Massachusetts Society for the Prevention of Cruelty to Children reported the growing evidence of physical abuse by parents, repeated injuries, and instances of deaths from various areas of the country. This specific report sought to gather and analyze data on 134 cases involving about 200 children who were reported to have been abused during one year.[6] In 86% of these cases the abuse was committed by either the mother or the father. These parents were found to have many problems and to be relatively young. Three distinct clusters of personality characteristics were identified: 1. hostility and aggressiveness traceable to early childhood experience;[7] 2. rigidity, compulsiveness and lack of warmth; 3. strong feelings of passivity and dependence, where parents competed with their children for love and attention of their spouses; in this group general depression was frequently interwoven as part of the personality pattern; 4. significant degree of physical disability among fathers who were dependent on mothers for support.
It was found that generally one child in the family was selected for abuse, and once begun there was a tendency for the abuse to be repeated against the selected child.
In making treatment decisions three factors appear of primary importance: (1) the degree and extent of pathology in the family; (2) the apparent need of immediate protection for the child; and (3) the prognosis for success in helping the parent to effect change.
In reviewing the literature the investigators found an unfortunate separation of the medical aspects, the psychiatric aspects and the legal aspects of these problems. They recognized the importance of continuing social work for these families, but found that, once identified, community responsibility for dealing with the problems was inadequate. They saw the need for a more comprehensive approach which would include protection of the child and social treatment of the family.
Legislation without thoughtful implementation that includes adequate diagnostic and case work treatment services was viewed as unsound. “ Even gross criteria must be developed to differentiate the parents who can utilize professional help from *378 those whose personality development has been so arrested, twisted, warped and fixed that the most highly skilled professional staff cannot now help them develop into adequate parents * * * Someone must bear the responsibility for identifying and acting on behalf of the child whose right to health conflicts seriously with the rights of parents who cannot be helped to meet their responsibilities before the child sustains physical -or emotional injury.[8]
While accurate histories are seldom obtainable, the development of the use of X ray has given additional confidence to the experienced clinician who suspects deliberate injury to an infant or young child.[9] Dr. Finberg, chief of the division of pediatrics at Montefiore Hospital, reports that while the history given is usually that the baby either fell from a bed or chair or that an arm or leg became caught in the slat of a crib, when something was found on X ray, such as fracture, the odds have been four out of five (80%) that the trauma was deliberate and not accidental ’ ’.
With such objective tools and such clinical experience, one must question whether it is sound to leave the determination, of whether the infant or young child is to be released to the adults who had care of the child, to nonmedical personnel in the Department of Welfare without full investigation by a court.
Present legislation in New York seems peculiarly inadequate to protect the “ battered child, in a big city like New York,[10] It would seem that several amendments should he considered to make the law more effective,
*379 1. The law should require that not only a physician, but any teacher, registered nurse, visiting nurse, or social worker, acting in an official capacity and believing that a child has been abused or neglected, shall report the case to the police.[11]
2. A written report to the responsible protective service should be required from any physician or hospital without delay where there is suspicion that a child has been abused or battered.
3. Immediate reporting should be required to the police by physicians or hospitals as well as the Protective Services of the Department of Welfare.
4. The Department of Welfare Protective Services Unit should be required to employ licensed social workers to investigate all cases of reported battered or abused children.
5. Where there is evidence of willful neglect or abuse the Department of Welfare Protective Services Unit should be required to file a petition in the Family Court to secure a prompt hearing and adjudication.
The serious nature of the charge of 11 battering ’ ’ or physical abuse of a child by a parent or guardian requires a judicial determination, whore a court can subpoena witnesses and provide a forum in which all evidence can be submitted. The continuation of supervision by a social agency, without such an adjudication, fails to provide adequate protection for the child or a determination to which the parents or guardian are entitled. Finally, in New York City, where anonymity is so easily achieved, it would seem that some procedure should be developed so that Avhere there has been suspicion of abuse, a central clearing house Avould register such cases, and such information Avould immediately be available to any hospital which subsequently examined a child. There is no doubt that in the instant case the infant Avould, Avith such information, not have been released by Harlem Hospital after emergency care only to bo subjected to further abuse. A method of identification for follow-up purposes is now being used in one area in Pennsylvania on a voluntary basis.[12]
*380 The case of Marion is but one example of the inadequate protection now afforded under existing legislation. No report of the serious first injuries discovered by Sydenham Hospital was made to either the police or the court. The worker assigned by the Protective Services Unit was untrained and could not through monthly visits protect this infant from further abuse. No real service was rendered to the parents. The second hospital to which the infant was taken in October had no knowledge of the previous history at Sydenham. The reports of both hospitals were not submitted in writing until long after the incidents. In short, neither “ protection ” for the infant nor services to the parents were provided in timely or meaningful fashion. The law, as written, and its implementation in New York City fail to assure either.
It is directed that this child shall be discharged to the maternal grandmother under the supervision of the court. Visitation by the mother shall be arranged in the home of the grandmother on the mother’s request, but the mother is directed not to remove the child or take the child out except in the presence of the grandmother. The mother and stepfather are referred for casework services to a family casework agency. Order of protection to maternal grandmother to include terms of visitation. Progress report to be submitted to this court on September 15,1966.

. See Matter of S. (46 Misc 2d 161 [1965]). The court there held that the condition of the infant spoke for itself and permitted a finding of neglect when -an infant suiters serious injuries in a home for which there is no satisfactory explanation.

. United Slates Department of H. E. ami W. Proposals for Drafting Principles and Suggested Language for Legislation on Public Welfare and Youth Services, Children’s Bur. 1957, n. 1, p. 5.

. United States Department of H. E. and W. The Abused Child, Principles and Suggested Language for Legislation on Reporting of the Physically Abused Child (1963).

. United States Department of Health, Education and Welfare Administration, Children’s Bureau Release August 26, 1965, Only Alabama, Hawaii, Mississippi, Virginia and the District of Columbia had failed to enact abuse statutes.
The State of Illinois, Department of Children and Family Services, issued regulations requiring all physicians who had reason to believe an injury of a child under 16 years was due to physical -abuse or neglect to make immediate report to the department. Such reports may also be made to the local law enforcement agency with notice to the department. The department on such notice is required to make immediate investigation and provide directly or through a voluntary agency the protective services required to prevent further abuse. It is also required to file a petition in the appropriate court to seek removal of the child when it is deemed necessary. (Children and Family Serv. Reg., Nos. 2, 42, June 1, 1965.)
In Colorado reporting by physician, where there is cause to believe injuries of a child are not due to accident is made mandatory to the proper law enforcement agency. “ Law enforcement agency ” is defined to mean the Police Department in incorporated municipalities and the office of the Sheriff in unincorporated areas. In turn, the law enforcement agency is required to submit such reports to the Colorado State Department of Public Welfare which is charged with investigation, the provision of' protective services, and the institution of court action where indicated. (Colorado Rev. Stat., 1963, eh. 22, art. 13.)
In 1963 Pennsylvania enacted a law making- it mandatory on physicians, interns, 'residents, hospitals and pharmacies to report on “ injuries by deadly weapon or criminal act”. Under the Pennsylvania act adults are to be reported to the Chief of Police; children under 18 to the presiding Judge of the juvenile court or to the community child protective agency where such court or service exists. In their absence reporting is to be rendered to the police. (Pa. Penal Code, § 330; Act 492 of August 24, 1963, amdg. Act of June 24, 1939.)

. The Battered Child Syndrome, Editorial, CLXXXI (1962), p. 42.

. Physical Abuse of Children, An Agency Study by Bryant and others, Child Welfare, March, 1963, pp. 125-130.

. In the instant ease, it was found that the stepfather had been known to this court before he was seven on a series of neglect petitions. Both parents were narcotic addicts who had repeatedly abandoned their children. A psychiatric study done in 1961 when he was fifteen noted the boy’s anger with hie parents because they had children but were not ready to act as parents.

. Helen E. Boardman, Who Insures the Child’s Right to Health? Child Welfare League of America, The Neglected Battered Child Syndrome, July, 1963, p. 7. Mrs. Boardman had previously presented 11 **a series of 12 parents believed to have inflicted trauma: six of the children were under 12 months and all were under 3½ years of age. All but one had a history of repeated injuries. Three were dead. Two of them had died of injuries that occurred after the parent had been convicted and placed on probation * * * This indicates the high degree of wishful thinking by courts and protective services and of the damage of assuming such parents have learned their lesson or should automatically be given il another chance ”. See Marion C. Morris and Robert W. Gould, Role Reversal: A Concept in Dealing with the Neglected, Battered Child Syndrome, Child Welfare League of America, The Neglected, Battered Child Syndrome, July, 1963, p. 33.

. See Dr. Lawrence Finberg, A Pediatrician’s View of the Abused Child, Child Welfare, January, 1965.

. During the period of August 1, 1964 through July 31, 1965, 73% of the reports of suspected injuries inflicted on children under section 483-d of the Penal Law came from New York City. (See Administrative Letter, N. Y. Dept, of Social Welfare, Nov. 30, 1965.)

. Such a provision is reported to have been recently added by the Ohio Legislature under its House Bill 218. (See N. Y. U. School of Law, Welfare Law Bulletin, No. 2, Feb., 1966, p. 5.)

. Freda G. Reinitz, Special Registration Project on the Abused Child, Child Welfare, Feb. 1965, p. 103. Beginning in February, 1964 the Philadelphia-Camden Social Service Exchange initiated a project which has since grown to include, in its Planning Committee, representatives of the Juvenile Aid Division of the Police Department (to whom cases are reported under the law), the protective agencies, the juvenile court, various units of the Public *380 Health Department and selected social agencies. Through the project any case in which there is evidence of neglect or abuse of such order as to require referral for protective care is to receive a special designation, “ a Red X ”. This supplements but does not supersede the mandatory reporting. The purpose of the “ Red X ” is to alert agencies that the reporting agency had information that it was prepared to discuss if a child or his siblings come to attention for medical and protective care. This is an experimental plan which is being followed to find how cracks between services may be closed, to improve case finding and achieve more effective service, in the hope that more children can be saved from irreparable damage.